1

2

3

4

5

6

7

8               UNITED STATES  DISTRICT COURT

9                 Northern District of California

10                    San Francisco Division

11   EARL BROWN, SR, *et al.*,                No. C 11-02162 LB

12                   Plaintiffs,     **ORDER GRANTING IN PART AND**
                                     **DEYING IN PART MOTION FOR**
            v.                       **SUMMARY JUDGMENT**
13
     CITY AND COUNTY OF SAN
14   FRANCISCO, *et al.*,                      [ECF No. 72]

15                   Defendants.
     _____/
16

17                      **INTRODUCTION**

18       In this civil rights lawsuit alleging claims under 42 U.S.C. § 1983 and California state law,

19   Plaintiffs Earl Brown, Sr. and Helen Brown – individually and as the personal representatives of the

20   estate of their son, decedent Earl Brown, Jr. (hereafter, "Mr. Brown") – allege that San Francisco

21   County deputy sheriffs used excessive force that resulted in Mr. Brown's death in custody shortly

22   after the deputies restrained him and placed him in a safety cell.  First Amended Complaint, ECF

23   No. 26.[1]  Defendants move for summary judgment on the following grounds: (1) Plaintiffs have no

24   evidence that Defendants used excessive force; (2) the Sheriff's Deputy Defendants are entitled to

25   qualified immunity; (3) the City and County of San Francisco is immune from liability for prisoner

26

27   _____

28       [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-
     generated page number at the top of the document.

UNITED STATES DISTRICT COURT
For the Northern District of California

1 claims; and (4) Plaintiffs' claims under the Bane Act do not allege violations separate from their

2 constitutional claims.  The court grants in part and denies in part Defendants' summary judgment

3 motion.

**STATEMENT**

4

5 **I. FACTUAL ALLEGATIONS**

6       On March 28, 2010, at about 10:30 a.m., San Francisco police officers arrested Mr. Brown after

7 receiving a report that he threatened to execute a café worker.  Joint Statement of Undisputed Facts

8 ("JSUF") #1, ECF No. 88 at 2.  According to the Police Incident Report, Mr. Brown "violently

9 resisted [the officers'] attempts to place him in handcuffs and refused to give [them] his arms."

10 SFPD Incident Report, Nisenbaum Decl. Ex. A at 000731.  The officers tackled him to the ground

11 during the course of the arrest and struck him with closed fists and knees.  *Id.*  Officer Cota reported

12 that "Brown was face down on the floor with both Officers Buckner and Ortega on Brown's back.  I

13 moved to the other side of Brown.  In an attempt to gain physical control of Brown's upper body, I

14 placed my right arm and hand around Brown's head."  *Id.* at 000733.  The officers also reported that

15 Brown bit Officer Cota's hand and Officer Ortega's hand was injured during the encounter.  *Id.* at

16 000733-34.  Mr. Brown was 43 years old, 6 feet tall, and 190 pounds.  JSUF #20-21.

17       The police charged Mr. Brown with felony counts of making terrorist threats and battery on a

18 police officer and misdemeanors counts of resisting arrest, obstructing an investigation, and trespass.

19 JSUF #1.

20       Mr. Brown was transported to County Jail 1.  *See* JSUF #2.  During the initial booking search,

21 deputies found a small amount of crystal methamphetamine inside Mr. Brown's right shoe.  FAC

22 ¶ 13.  At about 3:05 p.m., San Francisco County Registered Nurse Rita Connolly conducted a

23 medical intake screening on Mr. Brown.  *See* SFPD Homicide Investigation Interview of Rita

24 Connolly ("Connolly Interview"), Nisenbaum Decl. Ex. C at 001347.  She watched Mr. Brown walk

25 from the holding cell to her office, took his vital signs, and asked him a series of questions.  *Id.*  Mr.

26 Brown complained that the police had injured his left wrist but denied any other injuries.  *Id.* at

27 1348-55.

28       At about 4 p.m., as part of the booking procedure, San Francisco Deputy Sheriff Reymundo

1    brought Mr. Brown from holding cell 11 to the DNA sample desk to collect a DNA sample.  *Id.*

2    There is a video of the process at the DNA desk.  *See* Peou Decl. Ex. B, ECF No. 81-2.  Deputy

3    Reymundo provided Mr. Brown with a form to sign that explained the DNA sample procedure.

4    Nisenbaum Decl. Ex. C at 001348-55.   Mr. Brown refused to voluntarily provide a DNA sample,

5    stating that he believed his constitutional rights were being violated and that the FBI was watching.

6    JSUF #3; *see* Reymundo Dep. at 56-61, Nisenbaum Decl. Ex. D.

7        Deputy Reymundo radioed for Defendant Senior Deputy Saul Rodriguez, who was acting as the

8    watch commander and supervisor, for assistance.  *See* Reymundo Dep. 59:18-60:17; Rodriguez Dep.

9    at 62-65, Nisenbaum Decl. Ex. E.  Senior Deputy Rodriguez responded to the radio call and

10   informed Mr. Brown that they were required to collect saliva, not blood, and that if he refused, he

11   would be charged with failure to comply with the law.  Rodriguez Dep. at 73-74.  Mr. Brown kept

12   objecting to giving a blood sample, even though Deputy Reymundo and Senior Deputy Rodriguez

13   repeatedly explained that they were not going to take blood, only a cheek swab.  *See* Reymundo

14   Dep. at  58, 61.

15       According to the deputies, Mr. Brown was very loud during this discussion but did not

16   gesticulate wildly, threaten them, or strike at them.  *See* Reymundo Dep. at 67-68; Rodriguez Dep. at

17   74-75.  Deputy Sapak Peou was standing nearby listening to the conversation.  *See* Peou Dep. at 34-

18   36, Nisenbaum Decl. Ex. F.  Deputy Peou looked at Mr. Brown's field arrest card and noticed that

19   he had been arrested and charged with three felony counts of battery on a police officer.  *Id.* at 28-

20   30; Peou Decl. ¶¶ 4-5, ECF No. 81.  Deputy Peou then decided to handcuff Mr. Brown for officer

21   safety reasons.  Peou Dep. at 34-36; Peou Decl. ¶ 5.  Mr. Brown did not resist being handcuffed and

22   was compliant.  Peou Dep. at 36-37; JSUF #4 ("Deputy Peou asked to place handcuffs on Brown

23   and Brown complied").

24       Senior Deputy Rodriguez testified that he ordered the deputies to escort Mr. Brown to a holding

25   cell.  Rodriguez Dep. at 88.  Deputies Peou and Barbieri began escorting Mr. Brown toward holding

26   cell 11.  JSUF #5.  They each took hold of one of Mr. Brown's hands and arms as they walked.

27   JSUF #5.  Senior Deputy Rodriguez and Deputy Reymundo followed Mr. Brown down the corridor.

28   JSUF #6.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    As they walked out of the frame of the video, Deputies Peou and Barbieri and Mr. Brown began

2    to struggle.  *See* Video at 59:11-15.  The video clearly shows a struggle.  It is not possible to tell

3    from the video alone whether Mr. Brown necessarily was resisting the deputies or whether the

4    deputies were pulling up Mr. Brown's arms.  On its own, it could be either (even though it also is

5    true that it is consistent with the deputies' account.)  At this point, the deputies and Mr. Brown walk

6    out of camera range toward the holding cell.

7    According to the deputies, Mr. Brown became resistant and began tensing up and kicking his

8    legs at them.  Reymundo Dep. at 71-72, 76; Interview of Deputy Barbieri at 001240, Nisenbaum

9    Decl. Ex. G.  Senior Deputy Rodriguez testified that he head someone say, "he kicked me," but no

10   other deputies claim to have said that.  *See*  Rodriguez Dep. at 88-89; Peou Dep. at 42, 46; Barbieri

11   Interview at 001244.  Senior Deputy Rodriguez then ordered the other deputies to take Mr. Brown to

12   the ground.  Rodriguez Dep. at 89; Peou Dep. at 42-43; Reymundo Dep. at 71-72, 77-80.  The

13   deputies testified that they used a leg sweep to take Mr. Brown to the ground face down, which

14   alerted other deputies, including Defendant Deputy Camarra, to respond to the area.  *See* Rodriguez

15   Dep. at 86-87; Peou Dep. at 42-43; Reymundo Dep. at 71-72, 77-80; James Dep. at 18-20,

16   Nisenbaum Decl. Ex. I; Kim Dep. at 60, Nisenbaum Decl. Ex. J; Camarra Dep. at 17-79, Nisenbaum

17   Decl. Ex. K.  Some of the deputies recalled that Mr. Brown continued to kick his legs while on the

18   ground.  *See* James Dep. at 20; Kim Dep. at 66-67; Rodriguez Dep. at 90; Camarra Dep. at 20, 22-

19   23.  Deputy Barbieri put a leg shackle on Mr. Brown's left leg and Deputy Camarra put the shackle

20   on Mr. Brown's right leg.  Barbieri Interview at 001244; JSUF #7.

21   Senior Deputy Rodriguez then ordered the deputies to take Mr. Brown to a safety cell instead of

22   a holding cell.  Rodriguez Dep. at 95-96.  The deputies walked Mr. Brown bent over and backwards

23   in handcuffs and shackles to safety cell 6.  JSUF #8.  The video footage picks this up as they reenter

24   from the holding cell area on their way to the safety cell.  The video shows the hallway outside the

25   safety cell but does not show what happened inside.  Senior Deputy Rodriguez and Deputies

26   Barbieri, James, Kim, Rapicavoli, and Reymundo entered safety cell 6 with Mr. Brown.  JSUF #9.

27   Deputy Camarra looked into the door of the safety cell for about ten seconds.  JSUF #10.  He

28   could not see into the safety cell to observe the safety cell placement.  *Id.*  He then stayed in the

UNITED STATES DISTRICT COURT
For the Northern District of California

1    general area for another minute before returning to his post.  JSUF #10.

2        While Mr. Brown was still in handcuffs and leg shackles, the deputies placed him in a prone

3    position on the floor of the safety cell.  JSUF #11.  Their accounts differ regarding whether Mr.

4    Brown complied with their orders to get into a prone position or whether they had to force him to his

5    knees.  *See* Rodriguez Dep. at 99-100 (complied); James Dep. at 34-35 (struggled; forced him to

6    knees); Barbieri Interview at 001244, 001247 ("we kneel them down"); Reymundo Dep. at 94 (could

7    not recall whether he got on his knees voluntarily as opposed to being physically forced down).

8        The deputies testified that once he was in a prone position, Mr. Brown began kicking and

9    rocking his body, trying to draw his knees up towards his chest, twisting, and flailing.  Rodriguez

10   Dep. at 99-100; Reymundo Dep. at 93-94, 97; James Dep. at 36; Kim Dep. at 89-90; Rapicavoli

11   Dep. at 66, Hannawalt Decl. Ex. H, ECF No. 75-2 at 9.  He was kicking and kicked Deputy

12   Reymundo, who was holding right leg, off.  Reymundo Dep. at 98.  In the safety cell, Senior Deputy

13   Rodriguez held down Mr. Brown's right arm.  Rodriguez Dep. at 102-04, 108-09.  Deputy Kim held

14   down Mr. Brown's left arm and put it in an arm bar.  Kim Dep. at 91-94.  Deputies James and

15   Barbieri held down Mr. Brown's legs.  James Dep. at 36; Barbieri Interview at 001244-45.  Deputy

16   Reymundo put his knee on Mr. Brown's hips.  Reymundo Dep. at 91, 98, 104.

17       Because he was in charge and supposed to supervise the placement, Senior Deputy Rodriguez

18   had another deputy (Deputy Rapicavoli) take his place restraining Mr. Brown's right arm.

19   *See* Rodriguez Dep. at 108-09, 113-14.  He then stood at the entrance of the safety cell and observed

20   the placement.  *Id.* at 114.

21       The deputies placed Mr. Brown's legs in a figure four leg lock.  Reymundo Dep. at 105-06;

22   Rodriguez Dep. at 108; Kim Dep. at 98-99.  A figure four leg lock is a defensive tactics position

23   where one of the subject's legs is crossed behind the other knee, and the front leg is bent over the

24   crossed leg, trapping it.  Using the figure four leg lock, the deputy can keep the subject's legs in a

25   controlled "X" position just by applying force to the subject's raised ankle.  *See* Kim Dep. at 99.

26   Senior Deputy Rodriguez testified that he ordered the leg lock.  Rodriguez Dep. at 108.

27       Deputy Kim said in an interview that another deputy used his leg on Mr. Brown's head to secure

28   him, and he reiterated that point in his deposition.  Kim Interview at 001456l; Kim Dep., Nisenbaum

UNITED STATES DISTRICT COURT
For the Northern District of California

Decl. Ex. M ("And at one point I saw a deputy, I don't know who it was, but I saw a deputy's leg go on the, on the inmate's head, because he kept on moving, to secure him."), Plaintiffs point to Deputy Barbieri's interview too, where he said that "Yes, today somebody had his head," but the context of the discussion suggests it is a reference to walking Mr. Brown into the safety cell. *See* Barbieri Interview, Nisenbaum Decl. Ex. G at 1255.  Sometimes the interview is inconsistent with the later deposition testimony.  For example, Deputy Reymundo refers in his interview to "two deputies who were maintaining control of his, his, the head and arm area. . . . Arms."  He makes this statement while describing the deputies' using the figure four lock and then extracting themselves out of the safety cell.  *See* Reymundo Interview at 001632, Nisenbaum Decl. Ex. L.  But in his deposition, he testifies that he did not see any officer strike Mr. Brown on his head or apply a bar to his neck or any pressure to his neck.  Reymundo Dep. At 101-02.

Other deputies say that the did not see anyone holding Mr. Brown's head or neck down.  *See* Reymundo Dep. at 101-02; Rodriguez Dep. at 111, 113.  Senior Deputy Rodriguez also testified that he never touched Mr. Brown's back or side, did not put any weight on him, and did not observe any other deputy put any weight on Mr. Brown.  Rodriguez Dep. at 109.  The San Francisco Sheriff's Department trains deputies to attempt to avoid restriction of breathing during restraint.  JSUF #23.  Senior Deputy Rodriguez testified that no carotid restraint and no choke holds were used.  Rodriguez Interview, Nisenbaum Decl., Ex. O at 1653.  He said that those restraints were "illegal in our department."  *Id.*; *accord* Camarra Dep., ECF No. 89-1 at 7 (explaining that the deputies are trained to avoid asphyxiation by avoiding putting a knee on someone's neck or head).

According to Senior Deputy Rodriguez, near the end of the struggle, Mr. Brown yelled, "I can't breathe."  *See* Rodriguez Interview at 001654, Nisenbaum Decl. Ex. O.  Senior Deputy Rodriguez claimed not to believe Mr. Brown's complaint, stating that "it's pretty simple.  If you're yelling, you're breathing."  *Id.*  Deputy James testified that he believed that while in the safety cell, Mr. Brown was screaming and grunting and that Mr. Brown made several statements to the effect that he did not want to give up his DNA, that it was a violation of his civil rights, and he did not belong there.  James Dep. at 46.

Once the deputies had Mr. Brown completely restrained, they removed the handcuffs and leg

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1  shackles. James Dep. at 41.  They tossed the shackles into the hallway outside the safety cell.  JSUF

2  #12.  About one minute later, Deputies Barbieri, Kim, Reymundo, James, and Senior Deputy

3  Rodriguez left the safety cell, all within 20 seconds of each other.  JSUF #12-13.

4      The deputies gave various, and sometimes contradictory, statements about whether Mr. Brown

5  was breathing when they left the safety cell.  Deputy James testified that when he was leaving the

6  safety cell, he heard Mr. Brown say something but did not recall what he said.  James Dep. at 46-

7  47.[2]  Deputy Kim told SFPD homicide investigators on March 29, 2010 at 12:46 a.m. (a few hours

8  after the incident) that when he left the cell, it looked like Mr. Brown "just gave up the fight" and

9  was not moving.  He said that he did not know whether Mr. Brown was breathing.  *See* Kim

10  Interview at 001449, 001461, Nisenbaum Decl. Ex. M.  In his deposition, however, Deputy Kim

11  testified that when he left the safety cell, he knew that Mr. Brown was alive because he "was

12  inhaling and exhaling really hard."  Kim Dep. at 118.  Senior Deputy Rapicavoli heard Mr. Brown

13  apologizing as they were removing the restraint gear and preparing to leave the safety cell, saying

14  "I'm sorry; I'm sorry; I'm sorry I made you guys do this; you didn't have to do this."  Rapicavoli

15  Dep. at 70-73, Nisenbaum Decl. Ex. H.  Mr. Brown was not yelling.  *Id.*  Deputy Reymundo

16  testified and told the SFPD investigators that he did not know whether Mr. Brown was breathing

17  when he left the safety cell.  *See* Reymundo Dep. at 116; Reymundo Interview at 001637.  Senior

18  Deputy Rodriguez reported that when he left the safety cell, he could hear Mr. Brown breathing

19  heavily.  Rodriguez Interview at 001646, 001654; Rodriguez Dep. at 127, 132.  Senior Deputy

20  Rodriguez was the last deputy to leave the safety cell.  *Id.* at 001646.  In total, the deputies were in

21  the safety cell with Mr. Brown for about five minutes.  JSUF #14.

22      Shortly after the deputies closed the cell door, Senior Deputy Rodriguez and Deputy James

23  checked on Mr. Brown.  *See* James Dep. at 51.  The video shows that this happened about five

24  minutes after the deputies closed the door.  Rodriguez Decl. ¶ 20.  They knocked on the door and

25  called out to Mr. Brown but he did not respond.  James Dep. at 51; Rodriguez Dep. at 141-42.  They

26  _____

27      [2]  In their opposition brief, Plaintiffs state that James did not tell the SFPD Homicide
   Investigation Team this information during his interview.  *See* Opp'n at 11 (citing James Homicide
28  Interview CCSF 1424-25).  The parties did not provide the court with a transcript of this interview.

1   then entered the safety cell and found Mr. Brown to be unresponsive.  JSUF #15.  Deputy Rodriguez

2   said in his interview that he could hear Mr. Brown breathing.  Rodriguez Interview at 1647,

3   Nisenbaum Decl., Ex. O.  Various attempts were made to revive Mr. Brown, but a Rescue Captain

4   declared him deceased at 5:51 p.m.  JSUF #16. [3]

5       San Francisco Homicide interviewed the deputies that day and night.  *See* Time Stamps on

6   Interviews.  The deputies involved in the restraint of Mr. Brown were in the break room together

7   after the incident.  *See* James Dep. at 72, Nisenbaum Decl. Ex. I.  Deputy James was there until he

8   was interviewed, which he estimated as about an hour.  *Id.* at 73.  People were taken from the break

9   room one at a time before they were interviewed.  *Id.* at 74.

10      San Francisco County Assistant Medical Examiner Dr. Ellen Moffatt performed an autopsy on

11  Mr. Brown.  *See* Moffatt Dep. at 8, Hannawalt Decl. Ex. I, ECF No. 76-1 at 5; *see* Autopsy Report,

12  Hannawalt Decl. Supp. Reply Ex. D, ECF No. 92-4.[4]  Dr. Moffatt documented blunt force injuries to

13  Mr. Brown's head, neck, chest, abdomen, back, and extremities.  *See* Autopsy Report at 9-10, 12-13,

14  16.  She examined Mr. Brown's eyes and noted that "[t]he conjunctivae are clear and slightly

15  congested without petechial hemorrhages, pallor, of icterus.  The sclerae are white and slightly

16  congested without petechial hemorrhages or icterus."  *Id.* at 8.  Dr. Moffatt also took photographs of

17  Mr. Brown's body.  *See id.* at 13.

18      Toxicology tests showed that at the time of his death, Mr. Brown had a methamphetamine level

19  of .22 mg/liter and an amphetamine level of .02 mg/liter in his peripheral blood.  JSUF #17.  Mr.

20  Brown's heart weighed 470 grams and he had a 30% stenosis of his left anterior descending artery.

21  JSUF #18-19.  Mr. Brown had a black-pigmented thyroid.  JSUF #22.

22

23          [3]  Plaintiffs also submit the SFPD homicide interview with inmate Anthony Hughes, who

24  was there that night (apparently next door to the safety cell) and who said that he heard Mr. Brown
    saying "I can't breathe" and "I'm not resisting" and said he saw (although it does not seem that he

25  could) the deputies kicking Mr. Brown while he was on the ground.  *See* Nisenbaum Decl. Ex. N.

26  Defendants object to this evidence as hearsay.  *See* Reply at 15.  It is hearsay, and the court does not
    consider it in deciding this motion.

27

28          [4]  The Autopsy Report attached to Defendants' motion was incomplete, but they filed a
    complete copy with their reply brief.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Dr. Moffatt's report states that the cause of death was "LETHAL CARDIAC ARRTHYMIA

2   [*sic*] FOLLOWING RESTRAINT DURING METHAMPHETAMINE INTOXICATION."  Autopsy

3   Report at 16.  The Manner of death was determined to be "ACCIDENT."  *Id.*  The comment section

4   of the report states the following:

5       The decedent is a 43 year old male with a history of drug use.  Mr. Brown was arrested on
        the morning of March 28, 2010 for resisting arrest and assaulting a police officer.  After he
6       was transferred from Mission Station to San Francisco County Jail, a bindle with white
        powder was found in his clothing.  He refused to give a DNA sample, and while being
7       escorted to a cell became combative and was restrained by handcuffs and leg shackles.  He
        was taken to a safety cell.  Mr. Brown was yelling (both words and vocalizing) and resisting
8       the deputies in the safety cell.  Mr. Brown was heard breathing heavily after being restrained.
        No deputy was on Mr. Brown's neck or upper or central back; one deputy was possibly on
9       his lower back/upper buttocks.

10      Approximately two minutes after the last deputy left the safety cell, he was found
        unresponsive.
11
        The decedent has no anatomic cause of death.  He has bruises (areas of subcutaneous
12      hemorrhage, mainly on the buttocks and extremities.  A small area of recent bruising is noted in
        the right superior digastric muscle (directly under the right side of the chin) most consistent with
13      holding the ambu-bag mask on the decedent's face during resuscitation.  The recent bruises in
        the left temporal muscle (on the left side of the head) and right posterior/lateral chest most likely
14      occurred during the struggle with restraint in the safety cell.  A bruise on the left posterior thigh
        does have inflammatory infiltrate (organization), indicating an older age for this bruise.  There
15      are no injuries of the posterior neck, upper or central back, or in the areas of the carotid arteries.

16      Toxicology studies of the blood show methamphetamine (0.22 mg/L) and an amphetamine
        (0.2 mg/L), consistent with use of methamphetamine before death.  The vitreous electrolytes
17      are unremarkable.  With a significant amount of stimulant in the decedent's blood, he was
        predisposed to a lethal cardiac arrhythmia during exertion.
18
        The decedent's body temperature was noted to be "normal" upon arrival of paramedics to the
19      safety cell and was 85.2 degrees F at the Medical Examiner's Officer (approximately 3 hours
        after death).  Without a greatly increased body temperature or a delirious mental state and
20      with a significant level of stimulant drug in his blood, a diagnosis of "excited delirium" is
        less likely.
21
        The physical and circumstantial evidence supports that with a reasonable degree of medical
22      certainty, the death in this case was caused by a lethal cardiac arrhythmia due to the
        methamphetamine following restraint.
23
        The manner of death is best certified as accident.
24

25  *Id.* at 16-17.

26      Plaintiffs submit the report of Dr. Werner Spitz, a forensic pathologist and toxicologist.  *See*

27  Spitz Report, Nisenbaum Decl. Ex. P.  Dr. Spitz reviewed the autopsy report, the autopsy

28  photographs, video evidence, and the pleadings, among other evidence.  *See Id.* at 1.  Based on the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   autopsy photographs, Dr. Spitz noted "evidence of a large bruise along the right collarbone

2   (clavicle) and over the airway (larynx or voice box).  The latter bruise is larger than 1 ½" wide . . . .

3   Additionally, there are small bruises within the strap muscles.  None of these injuries are described

4   in the autopsy report but are consistent with a death causing neck hold." *Id.* at 5.  Dr. Spitz also

5   noted bruises on the inside of Mr. Brown's lower lip that were "obviously caused by pressure of the

6   lower lip against the dentition."  *Id.*  Another photograph showed "an abrasion of the tip of the

7   nose."  *Id.* at 6.  Photographs of Mr. Brown's "eyes and eyelids show a multitude of bilateral tiny

8   pinpoint petechiae . . . ."  *Id.*  Dr. Spitz contrasted these observations with the autopsy report, which

9   indicated "that the conjunctivae are clear without petechial hemorrhage.  The nose is described as

10  unremarkable."  *Id.*

11      Dr. Spitz opined that:

12      Earl Brown Jr. died as a result of asphyxia caused by restraint in prone position with pressure
        on his back coupled with a neck hold.  Whereas, the certification of the cause of death given
13      by the medical examiner may be considered at face value as acceptable, it is based on limited
        circumstantial accounts not the complete autopsy findings and questionable interpretation of
14      the toxicological analytical results.

15      Had the Deputies not responded with prone restraint, compression and neck hold, Earl
        Brown, Jr., would not have died on March 28, 2010.
16
        Methamphetamine had no bearing on Brown's cause of death.
17

18  *Id.* at 10.  Finally, he stated "[a]ll my opinions are based on my education, training and experience

19  and are rendered to a reasonable degree of medical certainty."  *Id.*

20      Plaintiffs also submit the expert report of Roger Clark, an expert in police practices and

21  procedures.  *See* Clark Report, Nisenbaum Decl. Ex. S.  Mr. Clark reviewed the FAC, documents

22  produced during discovery, medical records, interview and deposition transcripts, video/audio

23  recordings, photographs of the SFPD Officers' injuries, and specified California POST Basic

24  Learning Domains, and various training videos, and Jail Standards.  *Id.* at 1-5.  Mr. Clark opined that

25  "proper handling and processing procedures were not followed and, as would be expected, are

26  connected with Mr. B[ro]wn's fatality.  As such the deliberate departures from the accepted methods

27  at the jail were so far below the established basic professional standards they can only be viewed as

28  deliberately reckless and dangerous . . . ."  *Id.* at 8.  He also opines that "[n]othing in the video

1    recordings demonstrate[s] anything to justify the use of force that was inflicted on Mr. Brown." *Id.*

2    at 9-10.  Finally, he criticizes the fact that the deputies were not individually sequestered between

3    the time that Mr. Brown died and the time that they were interviewed by investigators, but instead

4    "assembled together in the staff break room where they could discuss the incident together for

5    anywhere from 1 to 2 hours." *Id.* at 12.

6    **II. PROCEDURAL HISTORY**

7    Plaintiffs filed their original complaint on May 2, 2011 against the City and County of San

8    Francisco ("CCSF"), the San Francisco Sheriff's Department, and former Sheriff Michael

9    Hennessey in his official capacity.  *See* Complaint, ECF No. 1.  Defendants moved to dismiss the

10   original complaint in its entirety and the court granted the motion with leave to amend.  Motion,

11   ECF No. 7, Order, ECF No. 24.  On November 10, 2011, Plaintiffs filed an amended complaint

12   naming the original Defendants and adding San Francisco Deputy Sheriffs Rodriguez, Camarra, and

13   Barbieri in their individual and official capacities.  FAC, ECF No. 26 (identified first names as

14   "FNU," meaning, first name unknown).  The complaint has the following claims:

| Claim # | Claim | Defendants |
|---------|-------|------------|
| 1 | 42 U.S.C. § 1983--Wrongful Death (based on unreasonable force) | All |
| 2 | 42 U.S.C. § 1983--Deprivation of Familial Relationship (based on unreasonable force) | All |
| 3 | 42 U.S.C § 1983--*Monell* (based on a failure to train and a cover up of the death) | Doesn't specify in caption but presumably Sheriff Hennessey and the City and County of San Francisco |
| 4 | 42 U.S.C. § 1983--Wrongful death (based on unreasonable force) (Plaintiffs as personal representative of decedent) | All |
| 5 | Code of Civ. P. 377.60 and 377.61--Wrongful Death--Negligence | All |
| 6 | Cal. Civ. Code § 52.1--Wrongful Death | Rodriguez, Camarra, Barbieri |
| 7 | Assault and Battery--Wrongful Death | Rodriguez, Camarra, Barbieri |

Before Plaintiffs served Deputies Rodriguez, Camarra, and Barbieri, CCSF moved to dismiss the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   FAC.  Motion to Dismiss FAC, ECF No. 27; *see* 3/6/2012 Summons, ECF No. 37.  The court denied

2   CCSF's motion on January 17, 2012.  Order, ECF No. 32.  CCSF and former Sheriff Hennessey

3   answered on January 31, 2012.  ECF No. 33.

4          On March 1, 2012, Plaintiffs' counsel filed a Declaration in which he explained that he lost the

5   Original Summons and asked the court to issue a First Amended Summons.  *See* Declaration, ECF

6   No. 36.  The court issued summonses (all with the FNU designation) for Deputy Sheriffs Rodriguez,

7   Camarra, and  Barbieri on March 6, 2012.  ECF No. 37.  On March 8, 2012, Defendants served the

8   summons  "FNU Baribiera, Deputy" [*sic*] by serving "Bill Fein, Exc. Sec." who is designated by law

9   to accept service of process on behalf of the County of San Francisco Sheriff's Department.

10  *See* Proof of Service, Nisenbaum Decl. Ex. T, ECF No. 87.[5]

11         In their April 5, 2012 Joint Case Management Conference Statement, the parties explained that

12  "[s]ome, but not all defendants ha[d] been properly served.  The parties have met and conferred and

13  anticipate that all remaining improperly served defendants will accept service."  ECF No. 40 at 2.  In

14  addition, "[t]he plaintiff and City defendants are agreeable to consenting to trial of this case by

15  United States Magistrate Judge Beeler."  *Id.* at 9.

16         The court held a case management conference on April 12, 2012, and issued a pretrial order with

17  discovery and case management deadlines.  *See* Minute Entry, ECF No. 41; CMC Order, ECF No.

18  42.  In their next Joint CMC Statement, the parties addressed the service issues, stating:

19         Defendants City and County of San Francisco ("CCSF"), Sheriff Michael Hennessy, Deputy
            Sheriff Camarra and Deputy Sheriff Rodrigues [*sic*] have been served and have Answered
20         Plaintiff's First Amended Complaint.  Defense counsel is informed that Deputy Barbieri
            suffered a brain aneurism and therefore cannot participate in his defense.
21

22  11/20/2012 CMC Statement, ECF No. 55 at 2; *see also* 4/11/2013 CMC Statement, ECF No. 59 at 2

23  (same statement).  The April 11, 2013 case management statement also says that "[t]he plaintiff and

24  City Defendants (meaning all defendants) have consented to trial of this case by United States

25  Magistrate Judge Beeler."  *Id.* at 9.

26

27  _____

28         [5]  The parties do not dispute the sufficiency of service as to Deputies Rodriguez and
    Camarra.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    On January 14, 2014, Defendants Rodriguez and Camarra filed their Answer to the FAC. ECF

2    No. 68. On February 27, 2014, all named Defendants except Deputy Barbieri filed the pending

3    Motion for Summary Judgment. *See* ECF No. 71; Brief re Motion for Summary Judgment

4    ("Motion"), ECF No. 72; and supporting declarations, ECF Nos. 73-83. Plaintiffs timely opposed

5    the motion ("Opp'n"), ECF No. 84, and Defendants replied, ECF No. 91 ("Reply"). The court held

6    a hearing on April 3, 2014. *See* Minute Entry, ECF No. 93.

## ANALYSIS

## I. SUMMARY JUDGMENT STANDARD

9        The court must grant a motion for summary judgment if the movant shows that there is no

10   genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

11   law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material

12   facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about

13   a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

14   the non-moving party. *Id.* at 248-49.

15       The party moving for summary judgment bears the initial burden of informing the court of the

16   basis for the motion, and identifying portions of the pleadings, depositions, answers to

17   interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material

18   fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party

19   must either produce evidence negating an essential element of the nonmoving party's claim or

20   defense or show that the nonmoving party does not have enough evidence of an essential element to

21   carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

22   *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076

23   (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need

24   only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

25   (quoting *Celotex*, 477 U.S. at 325).

26       If the moving party meets its initial burden, the burden shifts to the non-moving party to produce

27   evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103.

28   The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence,

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    but instead must produce admissible evidence that shows there is a genuine issue of material fact for

2    trial.  *See Devereaux*, 263 F.3d at 1076.  If the non-moving party does not produce evidence to show

3    a genuine issue of material fact, the moving party is entitled to summary judgment.  *See Celotex*, 477

4    U.S. at 323.

5         In ruling on a motion for summary judgment, inferences drawn from the underlying facts are

6    viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith*

7    *Radio Corp.*, 475 U.S. 574, 587 (1986).

8    **II.  *MONELL* CLAIM**

9         Plaintiffs' third claim asserts supervisory and municipal liability under *Monell v. Department of*

10   *Social Services*, 436 U.S. 658, 694 (1978), for failure to train and an alleged cover-up.  *See* FAC,

11   ECF No. 26 at 9.  Defendants moved for summary judgment on the ground that there is no evidence

12   to support *Monell* liability.  *See* Motion at 19-20.  Plaintiffs concede that they lack sufficient

13   evidence and confirmed this at the hearing.  *See* Opp'n at 24-25.  The court grants summary

14   judgment for Defendants on claim three.

15   **III.  EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AMENDMENT**

16        Claims one and four assert Fourth Amendment violations based on Defendants' allegedly using

17   excessive force in restraining Mr. Brown and causing his death.  *See* FAC ¶¶ 29-30, 39-42.  No one

18   disputes the parents' ability to bring these claims as Mr. Brown's survivors and personal

19   representatives under California Civil Code § 277.20(a)-(b).  *See Tatum v. City & County of San*

20   *Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006).  The issue is whether the deputies used excessive

21   force against Mr. Brown as a pretrial detainee in violation of the Fourth Amendment. *See Pierce v.*

22   *Multnomah County*, 76 F.3d 1032 (9th Cir. 1996) (Fourth Amendment analysis applies to pretrial

23   detainees).

24        The Fourth Amendment to the United States Constitution protects persons against "unreasonable

25   searches and seizures."  U.S. Const. amend. IV.  It is undisputed that Mr. Brown was "seized"

26   within the meaning of the Fourth Amendment.  Thus, the issue before the court is whether the force

27   used during his seizure was "objectively reasonable."  *Arpin v. Santa Clara Valley Transp. Agency*,

28   261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

1   "Determining whether the force used to effect a particular seizure is reasonable under the Fourth

2   Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's

3   Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*,

4   490 U.S. at 396 (internal citations and quotations omitted).  To do so, a court must evaluate the facts

5   and circumstances of each particular case, including (1) the severity of the crime at issue, (2)

6   whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether

7   he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396

8   (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  The most important of these three factors is

9   whether the suspect poses an immediate threat to the safety of the officers or others. *Id*.  "In some

10  cases . . . the availability of alternative methods of capturing or subduing a suspect [also] may be a

11  factor to consider." *Smith v. City of Hemet*, 349 F.3d 689, 701 (9th Cir. 1994).

12  "The reasonableness of a particular use of force must be judged from the perspective of a

13  reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S.

14  at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see id*. at 396-97 ("'Not every push

15  or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the

16  Fourth Amendment.") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  This is

17  because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are

18  often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly

19  evolving – about the amount of force that is necessary in a particular situation." *Id*.

20  **A. Deputy Camarra**

21  The undisputed evidence about Deputy Camarra's use of force establishes that he did not violate

22  Mr. Brown's constitutional rights.  After Deputies Barbieri and Peou "used a leg sweep to take Mr.

23  Brown to the ground facedown" in the hallway, Deputy Camarra responded to the area. *See* Opp'n

24  at 8.  He grabbed Mr. Brown's right leg and placed it in the leg shackle. *Id.* at 9.  He then escorted

25  Mr. Brown to safety cell 6 along with the other deputies. *Id.*  When the other deputies entered the

26  safety cell with Mr. Brown, "Deputy Camarra stayed in the hallway near the general area of safety

27  cell 6 and walks away from the safety cell." *Id.*; Camarra Dep. at 32-35; *see* Video at 01:00:54-

28  01:02:22.  Deputy Camarra left the area of the safety cell several minutes before the other deputies

UNITED STATES DISTRICT COURT
For the Northern District of California

left the cell.  *See* Video at 01:02:22, 01:05:40.

As to the events in the hallway, Plaintiffs' police practices expert testified that if Mr. Brown was kicking at the deputies while on the ground, it would not be excessive force to put him in leg shackles.  *See* Clark Dep. at 37, Hannawalt Decl. Supp. Reply Ex. A, ECF No. 92-1 at 3.  Moreover, when asked to assume a version of the facts regarding Deputy Camarra that now is undisputed, Mr. Clark had no criticism of the force applied:

> Q.  Right.
>
> So assume for the sake of my question that Deputy Camarra responds to the sounds of the takedown, and he assists in placing the shackles on the prisoner on the ground and then he walks down the hallway without touching Brown in the same proximity and then returns to his work station, do you have criticism of any force applied by Deputy Camarra in this case?
>
> A.  No.

*Id.* 124:3-12.  The undisputed evidence, and Plaintiffs' expert, therefore, agree that Deputy Camarra did not employ excessive force.

Plaintiffs contend that Deputy Camarra still can be liable because he was an "integral participant" in the allegedly excessive use of force.  Opp'n at 21.  The court disagrees.  An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation."  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).  "Integral participation does not require each officer's actions themselves rise to the level of a constitutional violation."  *Id.* (quoting *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) (quotations marks and alteration omitted)).  "But it does require some fundamental involvement in the conduct that allegedly caused the violation."  *Id.*

In *Blankenhorn*, the Ninth Circuit reversed in part the district court's grant of summary judgment for the defendant officers in a case where the plaintiff alleged he was unconstitutionally arrested and subjected to excessive force.  *Id.* at 479-80.  The factual context was that the officers gave no warning that they were going to arrest Blankenhorn before gang-tackling him and later applying hobble restraints:

> At some point, [Officer] Nguyen grabbed [Blankenhorn's] arm and, when Blankenhorn pulled free, threatened to spray him with mace.  Blankenhorn threw his driver's license on the ground, but he did not take a combative stance, clench his fists, or otherwise make

1
2
3
4
5

threatening gestures.  When Nguyen asked him to kneel down so he could be handcuffed, Blankenhorn refused.  Almost immediately, Nguyen, Ross, and South gang-tackled him. Nguyen did not try to handcuff Blankenhorn before the three officers tackled him. Blankenhorn struggled for several moments before the officers brought him to the ground. Once on the ground, however, Blankenhorn did not attempt to prevent the officers from handcuffing him.  Even so, Nguyen punched him several times, and an officer or officers pushed his face into the pavement by shoving a knee into the back of his neck.  Once Blankenhorn was subdued, the officers placed hobble restraints on his ankles, which made it difficult for Blankenhorn to move and breathe.

6
7
8
9
10
11
12
13
14
15
16

*Id.* at 478.  With that context, the court considered whether different officers were integral participants in the allegedly unconstitutional conduct.  The court affirmed the district court's holding that an officer who arrived on the scene after the arrest was completed and an officer who provided crowd control were not integral participants.  *Id.* at 481 n.12.  On the other hand, the officers who tackled the plaintiff were integral participants.  *Id.*  So was the officer "who ordered [another officer] to use the hobble restraints."  *Id.*  Finally, Officer Kayano, who handcuffed Blankenhorn, also was an integral participant even though he did not use excessive force in doing so.  The court explained that Officer Kayano's "help in handcuffing Blankenhorn was instrumental in the officers' gaining control of Blankenhorn, which culminated in Ross's application of hobble restraints.  Therefore, Kayano's participation was integral to the use of the hobble restraints."  *Id.*

17
18
19
20
21
22
23
24
25
26
27
28

Here, Deputy Camarra was not an integral participant in the allegedly excessive force.  Unlike Officer Kayano in *Blankenhorn*, Deputy Camarra's actions were limited to the initial struggle in the hallway with Mr. Brown.  He then walked up the hallway as other deputies led Mr. Brown to the safety cell and he stood outside the doorway to the cell for a short time before walking away. Deputy Camarra's use of force was separate from the allegedly unconstitutional conduct, which took place inside the safety cell when the deputies tried to control Mr. Brown while removing his leg shackles and handcuffs.  Deputy Camarra did not direct the other deputies.  Nor is there any evidence that he had prior awareness of a decision to use excessive force on Mr. Brown.  *Cf Boyd*, 374 F.3d at 780 (officers who participated in the search of an occupied dwelling where other officers deployed a flash-bang device without warning were integral participants because they were aware of the decision to use the device, did not object to it, and participated in the operation knowing about the plan).  Accordingly, the court grants summary judgment in favor of Deputy Camarra on

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Plaintiffs' first and third claims.

2   **B. Senior Deputy Rodriguez**

3       Unlike Deputy Camarra, under *Blankenhorn*, Senior Deputy Rodriguez was an integral

4   participant in the allegedly unconstitutional conduct.  He was involved in restraining Mr. Brown

5   inside the safety cell and, according to his own account, supervised and directed the other Deputies.

6   Thus, the issue is whether the force used in restraining Mr. Brown in the safety cell was excessive,

7   not just whether Senior Deputy Rodriguez used excessive force himself.

8       An officer may use force to control a pretrial detainee who is resisting being placed in a safety

9   cell.  *Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1198 (9th Cir. 2002).  Courts have found

10  constitutional violations where "prone and handcuffed individuals in an agitated state have

11  suffocated under the weight of restraining officers."  *Drummond v. City of Anaheim*, 343 F.3d 1052,

12  1056-57 (9th Cir. 2003); *see also Arce v. Blackwell*, 294 Fed. App'x 259, at *1-2 (9th Cir. 2008).

13      Here, Defendants argue that the uncontested evidence shows that the deputies used reasonable

14  force and that Plaintiffs have no evidence to show that "the deputies used any force other than the

15  deputies identified in their statements and deposition."  Motion at 16.  The court disagrees.  As

16  discussed above, Dr. Spitz opines that Mr. Brown "died as a result of asphyxia caused by restraint in

17  prone position with pressure on his back coupled with a neck hold."  Spitz Report at 9.  Dr. Spitz's

18  report is based on the evidentiary record and – particularly when considered in the context of

19  evidence about a knee being used to the head and the officers' account of what happened – raises a

20  dispute of material fact.  If the fact finder were to find that Mr. Brown died "as a result of asphyxia

21  caused by restraint in prone position with pressure on his back coupled with a neck hold," a

22  reasonable juror could find that this constituted excessive force.

23      Defendants counter that the evidence Dr. Spitz cites is consistent with other causes of death.  For

24  example, the bruising on Mr. Brown's neck could have been caused when he scuffled with the SFPD

25  Officers who arrested him, one of whom had his arm around Mr. Brown's face and neck.  *See*

26  Motion at 16-17.  Other injuries may have been caused by attempts to resuscitate Mr. Brown by

27  performing CPR chest compressions and using an ambu-bag.  *Id.*; Reply at 16.  But at intake, Mr.

28  Brown reported only an injury to his hand.  *See* Connolly Interview at 1347, Nisenbaum Decl. Ex. C.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Determining which version of the facts is correct would require the court to weigh the evidence and

2   make credibility determinations improper on a motion for summary judgment.  As the court

3   explained in denying Defendants' motion to dismiss the FAC:

> resolution of this case . . . is particularly problematic given that the individual in the best
> position to provide further details has expired.  As the Ninth Circuit has explained, "[c]ases
> in which the victim of alleged excessive force has died 'pose a particularly difficult problem'
> in assessing whether the police acted reasonably, because 'the witness most likely to
> contradict [the officers'] story . . . is unable to testify.'" *Gregory*, 523 F.3d at 1107 (quoting
> *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  Thus, the court must assess the evidence
> to determine the credibility of the officers' account of the events.  *Id.*  And, following from
> these precepts, courts "have denied summary judgment to defendant police officers in cases
> where 'a jury might find the officers' testimony that they were restrained in their use of force
> not credible, and draw the inference from the medical and other circumstantial evidence that
> the plaintiff's injuries were inflicted on him by the officers' use of excessive force.'" *Id.*
> (quoting *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002)).

11   Order, ECF No. 32.  That is the situation here.  There are triable issues of material fact that preclude

12   granting summary judgment on the federal wrongful death claims against Senior Deputy Rodriguez.

13       Defendants' remaining arguments do not change this outcome.

14       Defendants argue that "[c]ourts consistently find that a[] law enforcement officer may use force

15   to control a resisting inmate, including weight on the limbs, back, and even neck, of the suspect.

16   Motion at 15.  Defendants rely on *Gregory v. County of Maui*, 523 F.3d 113, 1108 (9th Cir. 2008).

17   As discussed in more detail in the Order denying Defendants' Motion to Dismiss the FAC, ECF No.

18   32, the use of force in *Gregory* is distinguishable in many ways, including the following: (1)

19   Gregory was not handcuffed or shackled when the restraint began; (2) Gregory threatened the

20   officers with a pen and resisted their attempts to take it from him; (3) the officers were not in a

21   controlled setting (such as a jail); and (4) there were only three officers involved.  Here, Mr. Brown

22   was handcuffed and shackled, had no weapons, nor access to weapons, there were at least six

23   deputies involved in restraining him, and more were ready to help if needed.

24       Defendants also argue that case law requires Plaintiffs to do more than show "speculation and a

25   temporal connection between the use of force and Mr. Brown's death to create a triable issue that

26   Mr. Brown died as a result of excessive force."  Motion at 16.  Defendants rely on *Hunt ex rel.*

27   *Chiovari v. Dart*, 754 F. Supp. 2d 962, 978 (N.D. Ill. 2010), a prisoner wrongful death excessive

28   force case in which the court granted summary judgment to the defendants.  That case involved the

UNITED STATES DISTRICT COURT
For the Northern District of California

1   death of an inmate in custody following a blow to the head.  The issue was what caused the head

2   injury.  The inmate had fallen five months earlier when he was drunk and suffered a traumatic brain

3   injury, a fracture, aphasia, impaired cognition, and (thereafter) intermittent fainting spells.  *Id.* at

4   965.  Eyewitness testimony at the jail five months later was the decedent was in line to the property

5   cage when he fell, convulsing. *Id.* at 965-66.  The jail staff rendered medical attention.  *Id.*  The

6   ambulance arrived roughly five minutes later.  *Id.* at 966-67.  The medical evidence was extensive,

7   and doctors opined that the injuries could have resulted from a fall or a blow (or both).  *Id.* at 967-

8   71.  Plaintiffs' experts essentially said that the death was due to multiple blunt force trauma that had

9   to have come from an assault by a guard or an inmate.  *Id.* at 977.  The court held that the medical

10   opinions did not create a material issue of fact in part because they did not consider plaintiff's prior

11   brain injury.  *Id.*  The plaintiff also made no attempts to interview any witnesses, and had no

12   evidence showing what caused the trauma or who was responsible for it.  *Id.* at 978.  The court

13   granted summary judgment to the defendants, stating that "the mere fact that an injury occurred

14   while an individual was in . . . custody is not sufficient to avoid summary judgment – a plaintiff

15   must identify the specific unreasonable conduct that caused his or her injuries." *Id.* at 977, 981

16   (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 770-71 (7th Cir. 2005)).

17        Unlike the plaintiff in *Chiovari*, Plaintiffs specifically allege what caused Mr. Brown's injuries,

18   they identify who was responsible, they point to testimony by percipient witnesses about the use of a

19   knee to the head and the deputies' actions generally, the deputies acknowledged that such force

20   would violate their training and be illegal, and they have medical evidence to support their theory.

21   In other words, Plaintiffs have shown more than speculation and a temporal connection.  The case is

22   more like *Abdullah*, 423 F.3d at 764-66, 768-73, where the court concluded that there were triable

23   issues of fact for the jury in a case involving allegations of excessive force in the form of the police

24   officer's use of his knee and shin to apply force to the back for 30 to 45 seconds to subdue a man

25   who had been causing a disturbance at a shop.  *Id.* at 764-66.  When the police responded, the man

26   sat up, swung his belt, jumped up suddenly, and continued swinging the belt and growled.  *Id.*.

27   Three officers grabbed his arms and moved him against a car to gain control and thereafter took him

28   to the ground.  *Id.*  Thereafter, the man struggled, kicked his legs, moved his arm, and arched his

1    back, which is when the officer applied his knee and shin.  *See id.*  The man was still breathing after

2    cuffing but he stopped breathing and died within minutes.  *Id.* at 766.  The doctors all agreed he died

3    of chest and neck trauma, including a collapsed left lung and injuries consistent with strangulation.

4    *Id.; see also Ayala v. City of South San Francisco*, No. C 06-02061 WHA, 2007 WL 2070236, at *2,

5    *9 (N.D. Cal. July 13, 2007) (triable issues of fact about caratoid restraint used to subdue arrestee

6    who subsequently died; multiple officers tried to restrain him and applied pressure to parts of body

7    to prevent him from moving; officer admitted hitting him in the face two to three times); *see also*

8    *Ayala*.

9        It may be that the *Abdullah* and *Ayala* scenarios present stronger fact disputes militating against

10   summary judgment.  Still, on this record, the court cannot say that a verdict in favor of the

11   defendants on the claim for excessive force is the only conclusion that a reasonable jury could reach.

12   *See Gonzalez v. City of Anaheim*, No. 11-5630, 2004 WL 11274551, at *6 (9th Cir. Mar. 31, 2014)

13   (*en banc*).

14   **C.  Qualified Immunity**

15       Because there are fact questions regarding whether Senior Deputy Rodriguez may be held liable

16   for excessive force, the court next considers whether he is protected by qualified immunity.

17       "The doctrine of qualified immunity protects government officials 'from liability for civil

18   damages insofar as their conduct does not violate clearly established statutory or constitutional

19   rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231

20   (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances

21   two important interests – the need to hold public officials accountable when they exercise power

22   irresponsibly and the need to shield officials from harassment, distraction, and liability when they

23   perform their duties reasonably."  *Id.*  "The protection of qualified immunity applies regardless of

24   whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on

25   mixed questions of law and fact.'"  *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)

26   (Kennedy, J., dissenting)).

27       In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence for

28   resolving government officials' qualified immunity claims."  *Id.* at 232.  "First, a court must decide

UNITED STATES DISTRICT COURT
For the Northern District of California

1   whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see

2   Rules 50, 56) make out a violation of a constitutional right." *Id.* (citing *Saucier*, 533 U.S. at 201).

3   This part of the inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels*

4   *v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated

5   were the allegations established," then the officer is entitled to qualified immunity. *Saucier*, 533

6   U.S. at 201. "Second, if the plaintiff has satisfied this first step, the court must decide whether the

7   right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555

8   U.S. at 232. "Qualified immunity is applicable unless the official's conduct violated a clearly

9   established constitutional right." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).[6]

10      "The relevant, dispositive inquiry in determining whether a right is clearly established is whether

11   it would be clear to a reasonable officer that his conduct was unlawful in the situation he

12   confronted." *Saucier*, 533 U.S. at 202; *see also Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004).

13   This inquiry "must be undertaken in light of the specific context of the case, not as a broad general

14   proposition." *Saucier*, 533 U.S. at 201. "This is not to say that an official action is protected by

15   qualified immunity unless the very action in question has previously been held unlawful, but it is to

16   say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*,

17   483 U.S. 635, 640 (1987).

18      The Ninth Circuit has found constitutional violations where "prone and handcuffed individuals

19   in an agitated state have suffocated under the weight of restraining officers." *Drummond v. City of*

20   *Anaheim*, 343 F.3d 1052, 1056-57 (9th Cir. 2003); *see also Arce v. Blackwell*, 294 Fed. Appx. 259,

21   at *1-*2 (9th Cir. 2008). In *Drummond*, the officers determined that they needed to take Drummond

22   – an individual with a history of mental illness – into custody for his own safety. 343 F.3d at 1054.

23

24   ───────────────

25      [6] The Supreme Court has stated that the order in which these questions are addressed is left
     to the lower court's discretion. *Pearson*, 555 U.S. at 236 ("[W]hile the sequence set forth [in
26   *Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the
     district courts and the courts of appeals should be permitted to exercise their sound discretion in
27   deciding which of the two prongs of the qualified immunity analysis should be addressed first in
     light of the circumstances in the particular case at hand."). The Supreme Court also stated that the
28   order used in *Saucier* "is often beneficial." *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1   The officers leaned on his neck and upper torso despite Drummond's claims that he could not

2   breathe and that the officers were choking him.  *Id.* at 1055.  Drummond ultimately expired during

3   the incident.  *Id.*  The court determined that the force allegedly employed was severe and, under the

4   circumstances, capable of causing death or serious injury.  *Id.* at 1056.  The court then

5   acknowledged that some force was justified because of Drummond's potential danger to himself but

6   that this need was mitigated by the lack of an underlying crime and his history of mental illness.  *Id.*

7   at 1057-58.  In balancing the need for force and the amount of force that was employed, the court

8   concluded that "[t]he officers—indeed, any reasonable person—should have known that squeezing

9   the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a

10  degree of force that is greater than reasonable."  *Id.* at 1059.

11      Here, Plaintiffs argue that a reasonable officer should have known that "keeping an individual

12  restrained with his chest to the ground while applying pressure to his back and ignoring pleas that he

13  cannot breathe – constituted excessive force under the Fourth Amendment."  Opp'n at 23.  On this

14  record, the court agrees.  Mr. Brown was unarmed, handcuffed, shackled, outnumbered, and lying on

15  the floor of a safety cell inside a jail.  He was not directly attacking the deputies, but wriggling to get

16  free from their grasp.  Moreover, the deputies all had training in the dangers of positional asphyxia

17  and how to avoid it.  Under those circumstances, the court finds that a reasonable officer would have

18  known that pinning Mr. Brown to the ground, applying pressure to his back, and using a choke hold

19  would have been excessive force.

20      Defendants argue that *Drummond* is distinguishable because there, the plaintiff was not a danger

21  to himself, others, or the officers, and they continued to restrain Drummond even after handcuffing

22  him.  *See* Reply at 17.  In contrast, Mr. Brown was combative while the deputies were attempting to

23  remove his restraints.  *Id.* at 18.  Therefore, "Senior Deputy Rodriguez is entitled to qualified

24  immunity for his decision not to order deputies to stop removing the restraints when Mr. Brown

25  resisted, said he could not breathe, and continued yelling and/or talking."  *Id.*

26      The court agrees with Defendants' analysis, so far as it goes.  The problem is that Defendants

27  argue for qualified immunity based on their version of the facts.  On summary judgment, the court

28  resolves disputed issues of fact in Plaintiffs' favor, and considers not just Senior Deputy Rodriguez's

1    decisions, but whether the use of force in which he was an integral participant was excessive.  Given

2    the fact disputes (including Mr. Brown's cause of death identified in the Spitz Report) and the

3    holding in *Drummond*, the court finds that Senior Deputy Rodriguez is not entitled to qualified

4    immunity at summary judgment.  At trial, there are different ways to address the issue: (a) via a Rule

5    50(a) motion before the case is submitted to the jury; or (b) via a Rule 50(b) motion and using a

6    special verdict form to address specific fact issues.

7    **IV.  WRONGFUL DEATH IN VIOLATION OF THE FOURTEENTH AMENDMENT**

8        Plaintiffs' second claim is that Defendants' use of force unconstitutionally interfered with their

9    rights to familial relationships in violation of the Fourteenth Amendment.  *See* FAC ¶¶ 31-33.

10   Preliminarily, the court's Fourth Amendment analysis regarding Deputy Camara also means that

11   summary judgment is appropriate as to the Fourteenth Amendment claim.  *See Moreland v. Las*

12   *Vegas Metropolitan Police Dept.*, 159 F.3d 365, 371 n.4 (9th Cir. 1998) (where officers' conduct

13   was objectively reasonable, it does not offend substantive due process).  Plaintiffs do not argue

14   otherwise.  *See* Opp'n at 23-24 (addressing Fourteenth Amendment claim solely with regard to

15   Senior Deputy Rodriguez).  The claim thus is against Senior Deputy Rodriguez.

16       The Fourteenth Amendment's substantive due process clause protects against the arbitrary or

17   oppressive exercise of government power.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-

18   46 (1998).  Parents and children may assert Fourteenth Amendment substantive due process claims

19   if they are deprived of their liberty interest in the companionship and society of their child or parent

20   through official conduct.  *See Lemire v. Cal. Dept. of Corrections & Rehabilitation*, 726 F.3d 1062,

21   1075 (9th Cir. 2013) (parents and children); *Smith v. City of Fontana*, 818 F.2d at 1418-19; *Curnow*

22   *v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (parent); *Crumpton v. Gates*, 947 F.2d 1418,

23   1421-24 (9th Cir. 1991) (child); *cf. Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992)

24   (sibling has no constitutionally protected interest in brother's companionship under section 1983).

25       "[T]he Due Process Clause is violated by executive action only when it can be properly

26   characterized as arbitrary, or conscience shocking, in a constitutional sense."  *County of Sacramento*

27   *v. Lewis*, 523 U.S. at 845-47; *see Lemire*, 726 F.3d at 1075.  The cognizable level of executive abuse

28   of power is that which "shocks the conscience" or "violates the decencies of civilized conduct."  *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    at 846.  Mere negligence or liability grounded in tort does not meet the standard for a substantive

2    due process decision.  *Id.* at 849.  The *Lewis* case involved the high-speed pursuit of a suspect on a

3    motorcycle, which ended in a police officer hitting and killing the suspect with the car.  In

4    determining that the police officer's conduct did not "shock the conscience," the Supreme Court

5    analogized the high-speed chase to tense, rapidly evolving situations such as prison riots.  *Id.* at 852-

6    53.  The Court held that liability is judged on a higher standard than deliberate indifference and

7    turned on "whether force was applied in a good faith effort to maintain or restore discipline or

8    maliciously and sadistically for the very purpose of causing harm. . . ."  *Id.* at 852-53 (applying the

9    Eighth Amendment standard set forth in the prison riot case of *Whitley v. Albers*, 475 U.S. 312

10   (1986).  "Purpose to harm" in this context means acting with a purpose to harm the decedent for

11   reasons unrelated to legitimate law enforcement objectives.  *See Porter v. Osborn*, 546 F.3d 1131,

12   1137 (9th Cir. 2008).  By contrast, the deliberate indifference standard is appropriately used in

13   custodial situations where the officials have more time to make decisions about their actions.  *Id.* at

14   1137-40.

15        The standard to be applied turns on whether actual deliberation was practical under the

16   circumstances.  *See Ayala*, 2007 WL 2070236, at *9 (citing *Moreland*, 159 F.3d at 372).  Defendants

17   maintain that the situation was rapidly evolving as they tried to put Mr. Brown in a cell, and he

18   resisted them.  The deputies were in the cell with Mr. Brown for about five minutes.  JSUF #14.

19        Given the context, the court applies the purpose to harm standard.  *See Porter*, 546 F.3d at 1139-

20   40 (applying the purpose to harm standard and criticizing the district court for assuming that five

21   minutes was enough time for the officer to consider what he was doing before he acted).  As in

22   *Porter*, there was little time for the deputies to deliberate, and they had to react quickly as Mr.

23   Brown struggled.  Plaintiffs argue that the court should apply the deliberate indifference standard

24   because Senior Deputy Rodriguez "had time to slow down this encounter and think about his

25   actions."  *See* Opp'n at 24.  The court does not see how that is true in the context of the parties'

26   undisputed facts.

27        Then the issue is whether there are factual disputes that preclude summary judgment.  Mr.

28   Brown was arrested for, among other things, assaulting and injuring two police officers.  He refused

1    to comply with the standard booking procedures.  Based on Dr. Spitz's opinion, Mr. Brown died of

2    asphyxiation because he was pinned down and pressed into the floor while shackled and handcuffed,

3    possibly in a way that involved pressure to the neck or head (like a choke hold).  At least some of

4    the deputies ignored or disregarded his complaints that he could not breathe.  Finally, all of the

5    deputies were trained on the dangers of positional asphyxia and how to avoid it.

6        On the other hand, the issue is whether the deputies had a "purpose to cause harm" for reasons

7    unrelated to legitimate law enforcement objectives.  *Gonzalez*, 1014 WL 1274551, at *7 (holding

8    that the plaintiffs had produced no evidence of ulterior motives in case involving a vehicle stop, the

9    driver's refusal to comply with officer directions to turn off the car, and the driver's subsequent

10   driving off with an officer in the back, which resulted in the police officer's shooting him).  In

11   *Ayala*,  the court allowed the claim to go forward to the jury even though the police similarly argued

12   that Ayala was resisting.  But Ayala also was unarmed "and at no time did he attempt to kick, hit, or

13   take a weapon from" any of the multitude of officers, the "entire incident lasted over twenty

14   minutes," and the police had a plan to "restrain Ayala and administer the carotid hold."  *Id.* at *10.

15       Unlike *Ayala*, where the defendant did not struggle and where the time period was longer, this

16   case involves a struggling defendant.  The only issue is excessive force, and the court discerns no

17   evidence of an ulterior motive unrelated to legitimate law enforcement objectives.  The court grants

18   summary judgment on this claim in favor of Senior Deputy Rodriguez.

19   **V.  MUNICIPAL IMMUNITY ON STATE LAW CLAIMS**

20       CCSF argues that as a municipality, it is immune from liability for claims five, six, and seven,

21   which all are state law claims.  *See* FAC ¶¶ 41-57.

22       California Government Code § 844.6(a)(2) provides that unless an enumerated exception

23   applies, "a public entity is not liable for . . . [a]n injury to any prisoner."  Cal. Gov. Code § 844.6.

24   Section 844 defines "prisoner:"

25       As used in this chapter, "prisoner" includes an inmate of a prison, jail, or penal or
         correctional facility. For the purposes of this chapter, a lawfully arrested person who is
26       brought into a law enforcement facility for the purpose of being booked, as described in
         Section 7 of the Penal Code, becomes a prisoner, as a matter of law, upon his or her initial
27       entry into a prison, jail, or penal or correctional facility, pursuant to penal processes.

28       Based on the plain language of the statute, the court finds that CCSF is immune here.  Plaintiffs

UNITED STATES DISTRICT COURT
For the Northern District of California

1   nonetheless argue that there is a question of fact about whether Mr. Brown was a prisoner yet

2   because he was going through the booking process.  *See* Opp'n at 25.  But the statute provides that a

3   lawfully arrested person (undisputed here) becomes a prisoner when he is brought into a law

4   enforcement facility for the purpose of being booked.  Plaintiffs's cited authorities do not change

5   this conclusion.  For example, in *Lawson v. Superior Court*, 180 Cal. App. 4th 1372, 1386 (2010),

6   the plaintiff lived with her mother, who had been sentenced to a community-based facility under an

7   alternative sentencing program for women with young children.  Although she lived in a law

8   enforcement facility, the plaintiff was not a prisoner because she was "not in legal custody and

9   charged with an offense, was not serving time on a sentence and was not held under restraint."  *Id.* at

10  1388.

11      Similarly, in *Zeilman v. County of Kern*, 168 Cal. App. 3d 1174 (1985), the court held that there

12  was a material question of fact as to whether the plaintiff was a prisoner under section 844.6.  The

13  court relied on cases that "recognize a distinction between persons who are simply under arrest and

14  therefore are not prisoners and those persons who have become confined in a correctional facility or

15  institution under the authority of law enforcement authorities or legal process."  *Id.* at 1181 (citations

16  omitted).  Based on those cases, the court explained that "it appears the line of demarcation between

17  status as an arrestee and as a confined person is the completion of the booking process."  *Id.*

18  *Zeilman* involved an older version of Section 844 that included only the first sentence of the current

19  statute.  *See* 1996 Cal. Legis. Serv. Ch. 395 (S.B. 1493) (amending the statute to add the second

20  sentence).  The second sentence clarifies that a person is a prisoner for Section 844 purposes

21  regardless of whether booking is complete.

22      Because Mr. Brown was a prisoner for purposes of Section 844.6, CCSF is immune from

23  liability.  The court grants summary judgment in favor of CCSF on the state law claims.

24  **VI. NEGLIGENCE AND BATTERY CLAIMS (CLAIM FIVE AND SEVEN)**

25      "In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that

26  the defendant had a duty to use due care, that he breached that duty, and that the breach was the

27  proximate or legal cause of the resulting injury."  *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629,

28  305 P.3d 252, 255 (2013) (alterations omitted).  "[P]eace officers have a duty to act reasonably when

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  using deadly force." *Id.*  "[S]tate negligence law, which considers the totality of the circumstances

2  surrounding any use of deadly force, is broader than federal Fourth Amendment law, which tends to

3  focus more narrowly on the moment when deadly force is used." *Id.* at 639.  Nonetheless, "[a]s long

4  as an officer's conduct falls within the range of conduct that is reasonable under the circumstances,

5  there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the

6  least likely to cause harm and at the same time the most likely to result in the successful

7  apprehension of a violent suspect, in order to avoid liability for negligence." *Brown v. Ransweiler,*

8  171 Cal. App. 4th 516, 537–538 (2009); *Hayes,* 57 Cal. 4th at 632.

9      To prevail on a claim for battery against the deputies, Plaintiffs must establish that the deputies

10  used excessive force.  *See Ayala*, 2007 WL 200236, at *13.  California uses the Fourth Amendment

11  standard of reasonableness.  *See id.* (citing *Saman v. Robbins,* 173 F.3d 1150, 1157 n.6 (9th Cir.

12  1999).

13      The facts about Deputy Camarra do not establish a triable issue of fact regarding the negligence

14  and battery claims.  The court grants summary judgment as to him.

15      As to Senior Deputy Rodriguez, the disputed facts that allow the excessive force claims to go

16  forward also allow the tort claims to go forward.  As Defendants concede, California Penal Code

17  § 835a – which permits "[a]ny peace officer who has reasonable cause to believe that the person to

18  be arrested has committed a public offense may use reasonable force to effect the arrest, to prevent

19  escape or to overcome resistance" – does not alter that conclusion because the privilege does not

20  apply when an officer uses unreasonable force.  Motion at 21; *see Robinson v. Solano County*, 278

21  F.3d 1007, 1016 (9th Cir. 2002) (en banc) ("California denies immunity to police officers who use

22  excessive force in arresting a suspect.").  As with the claim of qualified immunity, the court cannot

23  apply the privilege at summary judgment.

24  **VII.  THE BANE ACT, CALIFORNIA CIVIL CODE § 52.1 (CLAIM 6)**

25      Defendants also move for summary judgment on Plaintiffs' sixth claim under the Bane Act,

26  California Civil Code § 52.1.

27      The Bane Act prohibits interference or attempted interference with a person's rights under

28  federal or California law by "threats, intimidation, or coercion."  Cal. Civ. Code § 52.1(a).  Federal

UNITED STATES DISTRICT COURT
For the Northern District of California

1  district courts applying the Bane Act have reached different conclusions about the conduct necessary

2  to support a claim.  One line of cases has held that the coercive conduct must be separate from the

3  alleged constitutional violation.  *See Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 953 (E.D.

4  Cal. 2011) (holding that "in order to maintain a claim under the Bane Act, the coercive force applied

5  against a plaintiff must result in an interference with a separate constitutional or statutory right.  It is

6  not sufficient that the right interfered with is the right to be free of the force or threat of force that

7  was applied.").  Other courts have concluded that a Bane Act claim may be based on the same

8  coercive conduct as a constitutional claim.  *See Bass v. City of Fremont,* No. C12-4943 TEH, 2013

9  WL 891090, at *5-6 (N.D. Cal. Mar. 8, 2013) (holding that the Bane Act applies where the

10  underlying statutory or constitutional violation involved threats, intimidation, or coercion, without a

11  separate showing of coercion).  In the absence of binding authority, the court finds persuasive the

12  line of cases permitting Bane Act claims based on the same conduct as an underlying constitutional

13  violation.  As discussed in *Bass*, this reading comports with the legislative history and the relatively

14  broad statutory interpretation advanced in *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 823,

15  842 (2004).  *See Bass*, 2013 WL 891090, at *5.

16      Defendants acknowledge the divergent lines of authority but urge the court to follow *Shoyoye v.*

17  *County of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012).  *See* Motion at 23.  In *Shoyoye*, the court

18  held that § 52.1 requires "a showing of coercion independent from the coercion inherent in the

19  wrongful detention itself."  203 Cal. App. 4th at 959.  *Shoyoye* is distinguishable on its facts.  There,

20  the plaintiff was lawfully arrested but detained for much longer than permitted by law because of a

21  negligent (and inadvertent) computer error.  *Id.* at 951-53.  In contrast, the constitutional violations

22  alleged here were deliberate and "intended to interfere with the exercise or enjoyment of a

23  constitutional right."  *Id.* at 957-58; *see also Bass* 2013 WL 891090, at *6 ("*Shoyoye* is best viewed

24  as a carve-out from the general rule stated in *Venegas*").

25      The court denies the motion for summary judgment on the Bane Act claim.

26                                    **CONCLUSION**

27      The court grants the motion for summary judgment on all claims against Deputy Camarra and

28  the City and County of San Francisco and grants summary judgment on the Fourteenth Amendment

1   claim against Senior Deputy Rodriguez.  The court otherwise denies the motion for summary

2   judgment.  This disposes of ECF No. 72.

3   **IT IS SO ORDERED.**

4   Dated: April 7, 2014

LAUREL BEELER
United States Magistrate Judge